TATE, Judge
(concurring in part, dissenting in part).
I concur with my esteemed brethren of the majority that the plaintiffs are not entitled to reconveyance of a lot with the specific frontage of 56.S feet, which is not the thing which the defendant was obligated to reconvey to them under the terms of the'counter letter.
However, I must respectfully dissent from the failure to accord these plaintiffs the alternative relief demanded by them, namely that the defendant be ordered to reconvey to them in accordance with his counter letter their undivided interest sold by them to him simultaneously with the execution of the counter letter. This counter letter, in my opinion, can be construed to mean that the defendant should reconvey to the plaintiffs their undivided interest to be conveyed to him (i. e., the thing) in the specifically described property, for the same price in cash as that he was to pay them for it (i. e., the price), upon the conclusion of the complicated proceedings following which defendant would acquire title from the various other co-owners, including absentees and minors (i. e., the time or terms.)
Further, it should be so construed, in> accordance with the intent of the parties-(LSA-C.C. Arts. 1945, 1950); and, where a meaningful construction is open to the court, the agreement should not be construed as did the majority so that the agreement is meaningless (LSA-C.C. Art. 1951).
It is also, in my humble opinion, unconscionable to permit the defendant brother to evade his obligations under the counter letter when, in return for his signature thereto agreeing to reconvey to his sisters their share in the tract in question, he received his sisters’ consent to his purchase of the property at private sale at a price they thought to be far lower than it would have brought at public sale.[1]
Not only is the evidence to this effect uncontradicted, but the defendant himself admitted this to be the fact; see his following testimony:
AtTr. 12:
“Q. But did you promise to sell them that if they would sign the sale?

“A. Yes, I promised that.”

At Tr. 20:
“Q. Didn’t you tell your three sisters, ‘If you all will sign this sale, I will sign an agreement to transfer you a share or part of land’?
“A. I had signed the agreement first, and then they had signed the paper.”
The witnesses to the counter letter who also witnessed the signature of the sisters to the private sale by which the defendant acquired their interest in the land testified that both transactions were completed at the same time.
*76 The counter letter .was drawn up by a persbn unskilled in the law, and it provides as follows:
“To Whom It May Concern:
u
“That I, Antoine Brunet do hereby oblige myself, heirs and assign, to sell to the following sisters,
“Mrs. Gertie Brunet Collins;
“Mrs. Suson Brunet LeBlanc;
' “Mrs. Isabelle Brunet Roddy:
"their- individual share or part that they have or own as heirs in property that I have or will acquire from the Estate of Armand Brunet, that they have .elect or choose to take their share' in land instead of cash* which said property being situated on the left descending bank of Bayou La-fourche, at abo.ut Forty Six miles from the City of Thibodeaux, measuring one arpent front by depth there to belonging and being bounded above by land of Armand Brunet, and below by land of Louis Guidry *, after that I will have title to same.” (Italics and aster-risks mine.)
Although obviously not skillfully drawn, as above stated I think that this counter letter adequately describes the “thing”, the “price”, and “terms” within the meaning of LSA-C.C. Art. 2462.
The agreement clearly shows in my opinion that Antoine Brunet agreed to sell to his sisters “their individual share or part that they have or own as heirs” (i. e., the thing)';- meaning their proportionate interest .therein owned at time of execution of the counter letter, which was before the sale thereof by the sisters to the defendant, in thé property described between the two asterisks in the above-quoted agreement. The statement that “they elect or choose to take their fehare in land instead of cash” to me has the obvious meaning that they would restore to their brother Antoine in cash their pro rata share of the purchase price “paid” by him[2] (i. e., the price), in return for his reconveyance to them of their original proportionate share of the land described, after the conclusion [3] (i. e., the time of payment in cash, or term) of the complicated execution of this sale by approximately eighteen parties including several absentees and minors.[4]
The majority finds that the final clause of the agreement — “after that I will have title to same” — amounts to an inconsistent *77 and meaningless declaration that Antoine Brunet would then own the property after he sold to the sisters whatever he agreed by the counter letter to sell them. I think contrariwise, that the clause is plainly meant to describe the date following which this obligation to reconvey the property to his sisters would arise,[5] namely after final vesting of the title to the property in himself by acquiring all the outstanding interests of the eighteen co-heirs, including assorted minors and absentees.
And if the instrument be considered ambiguous in these respects, the uncontra-dicted parol evidence explains that such was the intention and effect of the instrument. See also LSA-C.C. Art. 1957: “In a doubtful case the agreement is interpreted against him [i. e., the defendant] who has contracted the obligation.”
The defendant, Antoine Brunet, does not himself contradict this testimony, but confirms it.
He himself gives two reasons as self-justification for his refusal to reconvey to his sisters their share in the property per his agreement to do so:
(A) At Tr. 13 he states:
“Q. When your sisters asked you to transfer to them their share or part of land, what did you tell them?
“A. They didn’t ask me. They just came at home with a sheriff. They asked me if I was gonna talk with them. I told them no, if they were too dirty to come to see me, I wasn’t going to see them.”
(B) And at Tr. 17 he states:
“Q. And the only reason why you would not reconvey an interest in this land to your three sisters was that they waited too long. Is that correct?
“A. That’s right. They were supposed to come and have some paper made right then when I made the paper, and they didn’t do it.”
The former defense is of course legally meaningless. The facts show the latter defense to be completely without merit.
The sisters had signed the sale to their brother in September, 1953, although they received none of the proceeds at that time. The proceeds from this sale and that of other succession property were deposited to the account of an attorney for partition among the coheirs according to their respective greatly varying interests, after deduction of the succession and partition expenses.
The sisters, who recorded the present counter letter on February 27, 1954 after an altercation of one of them with their brother-defendant (who had offered to re-convey their share to them for a sum in advance of the computation by the attorney of the net value thereof), did not receive their share of the proceeds until after March 1st, 1954. The uncontradicted evidence reveals that immediately thereafter on March 3, 1954, the sisters through their *78 attorney demanded his compliance with his agreement per the counter letter to recon-vey to them their share of the property he had purchased from them and the other heirs.
It is not tenable for the defendant, who had not paid his sisters until March 1, 1954 [6] for their interest in the property he purchased, to complain that they had not prior thereto offered to re-purchase their own share thereof. As he himself stated, “What they wanted was my money to buy my land. They didn’t pay it before — and you wanna know why? — just because they didn’t have no money.” (Tr. 15) Of course, the money withheld from them until March 1st and needed by them to secure reconveyance of their interest in the property, was not defendant’s as he there claimed, but their own!
For the above assigned reasons, therefore, it is my strong feeling that the plaintiff-sisters are entitled to have reconveyed to them their undivided interest[7] in the property sold by them to their brother expressly and only upon his specific and admitted agreement that he would reconvey sáme to them after final execution of the complicated transaction involving the many other co-heirs. To permit him to receive the benefit of their voluntary execution of the private sale to him, without complying with the obligation they exacted from him in return for their releasing their own right to have the property sold at public auction for the highest price is, to me, the equivalent of putting the stamp of judicial approval upon apparent fraud and chicanery. The counter letter, which can be construed to have the meaning the parties intended (according even to the admission of the defendant), should not be interpreted so as to be meaningless; it should, instead be enforced according to the agreement and intent of the parties.
For these reasons, I respectfully dissent in part from the views of my esteemed brethren.

. The property was bought by the defendant for .$4,000 by deed recorded on February 5, 1954 (and dated December 1, 1958, although the attached documents indicate that the various parties signed at various dates before and thereafter, including for instance minor’s judicial authorizations to sell their share dated as late as January 14, 1954.) On March 17, 1954, a little over a month later, it was mortgaged to the State Bank and Trust Company of Golden Meadow for $11,500, almost three times the purchase price. (Article 8 of plaintiff’s petition, admitted by Article 8 of defendant’s answer.)

. Antoine Brunet did not pay the plaintiffs at the time they executed the sale to him in September, or any other heir for their interest in the land at the times his various co-heirs signed the sale to him extending over several months. He deposited the purchase price with the attorney handling the partition at the conclusion of the sale, for such attorney (after deducting the pro rata expenses) to send to the co-heirs their share of the purchase price, along with their share of the purchase price of other tracts of the succession. This latter was not done until after March 1, 1954, several months after the sisters executed the sale to their brother. See P-4, P-5.

. See in agreement: “after that I will have title to same.”

. The testimony in the record, including the record of a previous partition suit, reveals that over three generations four tracts of land had been acquired to which the various parties to the partition suit were heirs. Due to multiple marriages, and the variety of acquisitions thereof as separate or community property, the interests of the respective parties (which included several absentees and minors) varied widely, and also differed as between the tracts. Originally commenced as a partition suit, eventually three brothers purchased at private sale the tracts involved; the present being the only one which the present plaintiffs felt to have been sold at an inadequate price. The agreement of the heirs was to collect the proceeds, deduct the expenses of partition and sale, and then to divide the proceeds according to the proportionate interest of the parties. The partition proceedings were commenced on May 4, 1953, see P-5; the checks for the various heirs distributing their share of the proceeds (less deduction of the expenses) were dated March 1, 1954 (see P-5) and mailed to the heirs about the same time along with a 7-page tableau of distribution (see P-4).

. Tlie agreement thus reads: “ * * * I, Antoine Brunet do hereby oblige myself, heirs and assign, to sell to * * * [the plaintiffs their present proportionate interest in the described property that I have or will acquire from the Estate of Armand Brunet, for the cash price paid to them], after that I will have title to same [i. e., to the entire tract described immediately preceding ‘after’].” The common ungrammatical use of “that” does not alter the effect of this clause as modifying the preceding part of the sentence and the principal clause (“I oblige myself to sell”) thereof. To read it as the majority does, as if this last clause were set off by a semi-colon or period (that is, assuming the equally common grammatical misuse of a comma for a period or semi-colon), has the defect of rendering the clause and the entire agreement meaningless. See Article 1951, [LSA-]Civil Code: “When a clause is susceptible of two interpretations, it must be understood in that in which may have some effect, rather than in a sense which would render it nugatory.”

. When payment was accomplished through the attorney by mutual consent.

. Although this is described in the petition as undivided Himth interest in said tract (which was the average share of the purchase price of the two lots included therein), actually the ono-arpent tract purchased by defendant was composed of two one-half arpent tracts, described as Tracts “C” and “D”, acquired at different times; and in which, due to the complicated family relationships and the difference in marital status at the time their ancestors acquired same, their interests therein differed, being a t-üesth interest each in Tract C and a %2th interest each in Tract D. Of course they are entitled to have re-conveyed their fractional interest in each tract, rather than an undivided average interest in the combined tracts.